**OVERHEAD DOOR CORPORATION and GMI Holdings, Inc., Plaintiffs–Appellees,**

v.

**The CHAMBERLAIN GROUP, INC., Defendant–Appellant.**

No. 98–1428.

United States Court of Appeals, Federal Circuit.

Oct. 13, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 16, 1999.

Kenneth R. Glaser, Akin, Gump, Strauss, Hauer & Field, L.L.P., Dallas, Texas, argued for plaintiffs-appellees. With him on the brief were Michael Lowenberg, Steven E. Ross, and Alex Chartove.

John F. Flannery, Fitch, Even, Tabin & Flannery, Chicago, Illinois, argued for defendant-appellant. With him on the brief were Robert J. Fox and Karl R. Fink.

Before MICHEL, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

The United States District Court for the Northern District of Texas ruled on summary judgment that Overhead Door Corp. and GMI Holdings, Inc. did not infringe U.S. Patent No. Re. 35,364 (the '364 patent). *See Overhead Door Corp. v. Chamberlain Group, Inc.,* No. 95–CV–1648–D (N.D.Tex. Apr. 30, 1998) (order). The '364 patent claims improvements on remote control systems for garage door openers. Because the district court erred in concluding as a matter of law that the claims at issue cannot cover the accused device under the doctrine of equivalents or as structural equivalents, this court affirms-in-part, vacates-in-part, and remands.

I.

Chamberlain Group, Inc. owns the '364 patent. Both Chamberlain and Overhead Door manufacture and sell remote control garage door opener systems. Remote control garage door opener systems typically include hand-held, portable transmitters and a stationary garage door opening motor with a processing unit and receiver. To open or close a garage door, a user presses a button on the transmitter to send a signal to the receiver. The receiver relays the signal to a processing unit that directs the door motor to open or close the garage door.

To prevent signals of foreign transmitters from opening the door, these systems use coded signals. A unique code thus links each transmitter to its own system, and a garage door opener's processing unit verifies that the signal code comes from its own transmitter before activating the opening motor.

Before the '364 patent, garage door systems required users to install transmitter codes manually. A typical code installation system required the user to set matching dual in-line package (DIP) switches on the transmitters. These manual codes had shortcomings, including installation errors by inexperienced installers and limits on code length due to the size of DIP switches.

The '364 patent eliminates manual code switches in garage door transmitters, and enables a garage door opener to learn the identities of and respond to multiple transmitters with different codes. *See* '364 patent, col. 4, ll. 15–22. An embodiment of the invention described in the '364 patent includes two or more transmitters with lengthy, factory-programmed codes. The microprocessor in the receiver switches between "program" and "operate" modes. In the "program" mode, the microprocessor stores in a memory a pre-programmed code it receives from the transmitter. *See id.* at col. 3, ll. 40–48. The microprocessor

can store multiple codes in this manner. In the "operate" mode, the microprocessor verifies that a signal matches one of the stored transmitter codes. *See id.* at col. 3, ll. 49–58.

The '364 patent includes eight claims, all of which Chamberlain asserts in this action. Claims 1–4 were part of the original patent, U.S. Patent No. 4,750,118 (the '118 patent). Chamberlain added claims 5–8 during reissue proceedings. The two independent claims 1 and 5 recite:

1. A garage door operator for a garage door comprising,

a garage door operation mechanism with an output shaft connected to said garage door to open and close it,

a radio receiver,

a decoder connected to receive the output of said radio receiver,

a microprocessor connected to receive the output of said decoder and to said garage door operation mechanism to energize it,

a switch moveable between program and operate positions connected to said microprocessor to place said microprocessor in the operate or program mode,

a memory means for storing a plurality of addresses connected to said microprocessor when said switch is in the program position,

*a memory selection switch connected to said microprocessor,*

a plurality of radio transmitters with *different codes, said memory selection switch setable in a first position* at a time when a first one of said radio transmitters is energized so that the code of said first transmitter will be stored in said memory means and *said memory selection switch set in a second position* at a time when a second one of said radio transmitters is energized so that the code of said second transmitter will be stored in said memory means,

and said microprocessor placed in the operate mode when said switch is in the operate position so that either or both of said first and second radio transmitters when energized cause said microprocessor to energize said garage door operator mechanism.

5. An operator for controlling operation of equipment comprising:

a radio receiver,

a decoder connected to receive the output of said radio receiver,

a microprocessor connected to receive the output of said decoder and to said equipment to energize it,

first switch means for selection between program and operate positions connected to said microprocessor to place said microprocessor in the operate or the program mode,

a memory means for storing a plurality of addresses connected to said microprocessor when said first switch means is in the program position,

*a memory selection second switch means connected to said microprocessor,*

a plurality of radio transmitters with *different codes, said memory selection second switch means being adapted to select a first position* at a time when a first one of said radio transmitters is energized so that the code of said first transmitter will be stored in said memory means and *said memory selection second switch means being adapted to select a second position* at a time when a second one of said radio transmitters is energized so that the code of said second transmitter will be stored in said memory means,

and said microprocessor placed in the operate mode when said first switch means is in the operate position so that either or both of said first and second radio transmitters, when energized cause said microprocessor to energize said equipment.

'364 patent, col. 5, ll. 11–35; col. 6, ll. 7–30 (emphasis added).

Overhead Door's accused openers—marketed as the "Intellicode" system—also use factory-programmed identification codes instead of manual switches and "learn" to identify multiple transmitters. Like the invention claimed in the '364 patent, the Intellicode features "program" and "operate" modes, and stores transmitter codes in selected memory locations during the learning process. The Intellicode, however, does not use a manual, mechanical memory selection switch. Rather, the Intellicode features software that determines the memory location for each new code. The Intellicode's microprocessor, under control of the software, identifies unused locations in memory and automatically stores a new code in an unused and available location. The parties dispute whether the Intellicode's software-driven memory selection scheme is outside the scope of the '364 patent.

On August 7, 1995, Overhead Door filed a declaratory judgment action, seeking a judgment that the Intellicode does not infringe the '118 patent. Chamberlain counterclaimed, alleging willful infringement. The '118 patent reissued as the '364 patent in October 1996 and Overhead Door amended its complaint to include additional claims 5–8. The parties filed cross-motions for summary judgment. The court referred the motions to a special master for a recommendation.

The special master concluded as a matter of law that the Intellicode does not literally infringe the '364 patent. In reaching this conclusion, the special master construed the claim elements "memory selection switch" (claim 1) and "memory selection second switch means" (claim 5) to require "a switch *separate from* the microprocessor which is *user operated* to select different positions of the switch." *Overhead Door*, No. 95–CV–1648–D, at 36 (N.D.Tex. Jan. 13, 1999) (report of Special Master) (emphasis added). The special master further determined that the claims "[can]not be construed so broad[ly] to include a microprocessor controlled random

memory selection process." Because the Intellicode selects memory locations with software rather than a manual switch, the special master concluded that the Intellicode does not literally infringe the claims in suit.

The special master also concluded as a matter of law that the Intellicode does not infringe the '364 patent under the doctrine of equivalents. The special master identified the "function" of the "memory selection switch" and "memory selection second switch means" as "permit[ting] selection of a particular memory location at the receiver for subsequent storage of a transmitted code." *Id.* at 46. According to the special master, the Intellicode lacks this function because its microprocessor uses software to automatically select memory locations. Further, the special master noted that "the user is unable to predetermine ... memory location[s]" or replace a location with a new code. The special master therefore concluded that the Intellicode cannot infringe the '364 patent under the doctrine of equivalents.

The district court adopted the special master's report in its entirety, thereby granting Overhead Door's summary judgment motion of non-infringement and denying Chamberlain's cross-motion. Chamberlain appeals.

## II.

■■■■ This court reviews a district court's grant of summary judgment without deference. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307, 46 USPQ2d 1752, 1755 (Fed.Cir.1998). This court also reviews the district court's claim construction without deference. *See Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1456, 46 USPQ2d 1169, 1172 (Fed.Cir.1998) (*en banc*). Whether the accused device exactly contains each element, as properly construed, or its equivalent, is a determination of fact. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575, 34 USPQ2d 1673, 1676 (Fed.Cir.1995). In re-

view of the district court's summary judgment in favor of Overhead Door, this court draws reasonable inferences from the evidence in favor of the non-movant, Chamberlain. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

In dispute are three elements of claim 1: "memory selection switch," "switch moveable," and "different codes." Similar elements of claim 5 are in dispute. The first two elements of claim 5, however, are in means-plus-function format, i.e., "memory selection second switch means" and "first switch means."

### "Memory Selection Switch" – Claim 1

■ The district court construed the "memory selection switch" element of claim 1 to mean "a switch separate from the microprocessor which is user operated to select different positions of the switch." The claim uses the term "switch," a word connoting a mechanical device with different settings, such as "on" or "off." Claim 1 further defines the memory selection switch as "connected to" the microprocessor, "setable in" a first position, and "set in" a second position. This claim language is more consistent with a mechanical switch attached to the microprocessor, rather than software programmed into the microprocessor.

In the '364 patent's "Brief Description of the Drawings," the patentee states that "Fig. 2 illustrates in block form *the invention.*" Col. 2, l. 43 (emphasis added). Figure 2 complements the definition supplied by the claim language:

FIG. 2

Figure 2 shows the program/operate switch 22 as a mechanical switch, which alternates between "program" and "operate." Moreover, the drawing depicts the memory selection switch 23 as a mechanical switch with five separate numbered positions. The associated written description identifies the memory selection switch with 23, *see* '364 patent, col. 3, ll. 9–11, and describes it as a five-position, moveable switch separate from and *"connected to"* the microprocessor 44. *See id.* at col. 3, ll. 9–19 (emphasis added); *see also* Fig. 2. Again this part of the patent suggests a mechanical switch.

Finally, Chamberlain does not contest the special master's interpretation of the program mode "switch" as a mechanical toggle switch. To interpret the term "switch" consistently in the claim and to harmonize the drawing depiction with the

**1268**

claim language, this court confirms the district court's reading of the term "switch." Thus, the term "memory selection switch" means a mechanical device separate from the microprocessor. This interpretation is also most in harmony with the prosecution history of the reissue application, as explained later.

In reaching this claim interpretation, this court considered but rejected the contention that Figure 3 discloses as part of the claim a software embodiment for the switch of claim 1. Figure 3 of the '364 patent, shown below, illustrates how the invention receives and validates codes:

FIG. 3

In Figure 3, the two dialog boxes in the lower-right corner refer to storing the code at the location "pointed to" by the "code location pointer," "increment[ing]" the code location pointer, and "load[ing]"

the code location pointer with a value of one. The '364 patent, however, does not indicate whether the "code location pointer" is a particular embodiment of the "switch" of claim 1, or some other (unclaimed) component. "Code location pointer" appears nowhere in the claims. Moreover, the only reference to a code location pointer in the written description is a single sentence that does not illuminate Figure 3: "If the switch 22 is in the 'program' mode as shown in FIG. 3 when the incoming signal from a transmitter is received, the flow diagram is followed so as to store the new incoming program in the code location pointed to by the code location pointer 23." Col. 4, ll. 57–61. The vague terms in Figure 3 do not override the claim language and written description that closely identify the "memory selection switch" as a mechanical device. This court interprets "memory selection switch" to mean a mechanical switch with different positions, each position corresponding to a different location in memory, thus enabling the garage door operator to store codes in different memory locations. Thus, this court affirms on review the district court's interpretation of "memory selection switch."

■ Applying this claim construction to the accused device, this court affirms the district court's summary judgment of no literal infringement of claim 1. "Literal infringement of a claim requires that every limitation recited in the claim appear in the accused device, i.e., that the properly construed claim reads on the accused device exactly." *Amhil Enters., Ltd. v. Wawa, Inc.,* 81 F.3d 1554, 1562, 38 USPQ2d 1471, 1476 (Fed.Cir.1996). Claim 1 covers a mechanical "memory selection switch." The accused Intellicode system, in contrast, selects memory locations with a software program, not with a mechanical switch. Thus, the "memory selection switch," as correctly construed, is literally absent from the Intellicode. Therefore, the Intellicode does not literally infringe claim 1.

■ The district court erred, however, in also deciding on summary judgment that the Intellicode did not infringe under the doctrine of equivalents. The doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865, 1875 (1997). An element in the accused product is equivalent to a claim element if the differences between the two are "insubstantial" to one of ordinary skill in the art. *Warner–Jenkinson,* 520 U.S. at 39–40, 117 S.Ct. 1040; *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1517, 35 USPQ2d 1641,- 1644 (Fed.Cir.1995) (*en banc*), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The district court found as a matter of law that the Intellicode had no equivalent of the memory selection switch claim element.

■ "Although equivalence is a factual matter normally reserved for a fact-finder, the trial court should grant summary judgment in any case where no reasonable fact-finder could find equivalence." *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423, 44 USPQ2d 1103, 1106 (Fed.Cir.1997). This case does not satisfy this lofty standard. The record contains considerable evidence, including several reports and declarations by Chamberlain's expert, Dr. Rhyne, that one of ordinary skill in the art would find the Intellicode's software-driven memory selection system insubstantially different from the hardware switch of claim 1. Dr. Rhyne averred in his June 2, 1997 report: "[it is a] fundamental and well understood tenet of the computing art [that] . . . '[a]ny software process can be transformed into an equivalent hardware process, and any hardware process can be transformed into an equivalent software process.'" *See* ED KLINGLER, MICROPROCESSOR SYSTEMS DESIGN 5 (1977). Dr. Rhyne stated that this "dualistic transformation," known as the "hardware/software" tradeoff, effectively

means that the selection of a software pointer for a microprocessor versus a hardware switch to control a microprocessor-based system is simply a matter of design choice. This record evidence shows that one of skill in the art would recognize these alternative systems as interchangeable substitutes. Drawing all reasonable inferences in favor of Chamberlain, as this court must in reviewing the summary judgment of non-infringement, this court concludes that Dr. Rhyne's statements and supporting citations to computer science literature show a genuine issue of material fact precluding summary judgment.

In discerning this genuine factual issue, this court also considered the district court's interpretation that a mechanical switch would necessarily require a human operator. In operation of a mechanical switch, a human operator would indeed set the memory selection switch to one of five positions. This "user operated" characteristic of a mechanical switch, however, would not necessarily preclude a finding that software performs equivalently without human operation. Indeed in other contexts, this court has noted the interchangeability of hardware and software. *See, e.g., Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935, 4 USPQ2d 1737, 1740 (Fed.Cir.1987) (*en banc*) ("If ... the accused devices differ only in substituting a computer for hard-wired circuitry, [the patentee] might have a stronger position for arguing that the accused devices infringe the claims."). Moreover the Supreme Court has acknowledged that interchangeability can be one of the hallmarks of an equivalent. *See Warner–Jenkinson,* 520 U.S. at 37, 117 S.Ct. 1040 ("known interchangeability ... for an element of a patent is one of the express objective factors ... bearing upon whether the accused device is substantially the same as the patented invention"); *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328, 331 (1950) ("An important factor [in determining equivalency] is whether persons reasonably

skilled in the art would have known of the interchangeability....").

This court has explained that the "function-way-result" test may help detect an equivalent, particularly for mechanical elements. *See Dawn Equipment Co. v. Kentucky Farms Inc.,* 140 F.3d 1009, 1016, 46 USPQ2d 1109, 1113 (Fed.Cir. 1998). The function-way-result test dictates that an element in the accused device is equivalent to the claim element if it "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank,* 339 U.S. at 608, 70 S.Ct. 854. Applying the function-way-result test to claim 1, the district court found that "the function of the memory selection switch [is] ... to permit selection of a particular memory location at the receiver for subsequent storage of a transmitted code, *by use of a switch connected to the microprocessor." Overhead Door Corp,* No. 95–CV–1648–D, at 24 (N.D.Tex. Jan. 13, 1999) (emphasis added). The district court then found that this function was "totally missing" from the accused device because "the user is unable to predetermine selection of specific, desired memory locations." This application of the function-way-result test erroneously incorporates the claim element's "way" into the definition of the function, effectively limiting the claim element to its literal terms.

The claim language and the specification explain that the "memory selection switch" functions to select memory locations. This claim element accomplishes its function by way of a mechanical switch. This particular switch constitutes the claim element's "way" of accomplishing the memory selection function, not the function itself. The result of this element is storage of codes in different memory locations. The record at this stage, preliminary to a trial, creates a genuine issue of material fact whether the Intellicode accomplished substantially the same function, in substantially the same

way, to achieve substantially the same result.

Moreover, contrary to the district court's determination, this court's ruling in *Sage Products* does not limit the range of equivalents to the memory selection switch in this case. In *Sage Products*, this court noted that the claim limitations "top of the container" and "over said slot" constituted "a precise arrangement of structural elements" and a "clear structural limitation" in a "relatively simple structural device." *Sage Prods.*, 126 F.3d at 1425. Finding that Sage's theory of equivalence – i.e., a container having two constrictions below its top was equivalent to the claimed container having a constriction above and a constriction below—would "remove entirely the 'top of the container' and 'over said slot' limitations from the claim," this court affirmed the district court's grant of summary judgment of non-infringement. *Id.* at 1423–24. Thus, the proposed application of the doctrine in *Sage Products* would have utterly written out of the claim not one, but at least two (maybe more) express limitations of the claim. Indeed under Sage Products' equivalents theory, a finding of equivalents for one limitation ("at the top") would necessarily require writing out of the claim another limitation ("over said slot"). No matter how the patentee purported to apply the claim to the accused device under the doctrine, the device was always missing at least one limitation. Thus, the claim language specifically negated the patentee's equivalence theory. Moreover, this court in *Sage Products* noted that "any subsequent change in the state of the art, such as later developed technology" would have been eligible for coverage under the doctrine of equivalents, thus clearly defining at least one type of expanded claim coverage under the doctrine. *Id.* at 1425.

In contrast to the facts in *Sage Products*, claim 1 of the '364 patent does not contain any clear structural limitations that preclude a reasonable jury from finding a software system equivalent to the claimed system. By definition, an equivalent does not fall literally within the claim language. Although the literal meaning of the "memory selection switch" does not cover the software-implemented Intellicode, this case does not preclude application of the doctrine under *Sage Products* because any application of the doctrine would not leave some aspect of the claim missing from the accused device. Applying the doctrine of equivalents to cover Intellicode's software does not vitiate the "memory selection switch" element. *See id.*, at 1423–24.

As properly construed, the "memory selection switch" means a mechanical switch for selecting memory locations. The question remains whether the Intellicode's software-driven memory selection scheme is equivalent to a mechanical switch. This issue remains for the fact-finder to determine at trial in view of the considerable evidence in the record.

### "Memory Selection Second Switch Means" – Claim 5

Claim 5 recites a "memory selection second switch means being adapted to select a first position ... and ... a second position." Because this claim element utilizes the term "means" and the claim does not specify any structure or material for performing the recited function, the district court properly held "memory selection second switch means" is a means-plus-function element under 35 U.S.C. § 112, ¶6 (1994). *See Al–Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318, 50 USPQ2d 1161, 1166 (Fed.Cir. 1999) ("if the word 'means' appears in a claim element in combination with a function, it is presumed to be a means-plus-function element"). Thus, "memory selection second switch means" covers the "corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶6 (1994).

The district court's determination of corresponding structure is a matter of claim construction, *see Chiuminatta*, 145

F.3d at 1306, which this court reviews *de novo*. *See Cybor*, 138 F.3d at 1456. Determining whether Figure 3 is a "corresponding structure" for the "switch means" of claim 5 requires the court to consult again the language of the claim and the other factors that inform claim meaning. Of course, the central focus remains on the claim language. The written description, the prosecution history, and admissible extrinsic evidence may supply context to understand the claim language. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576–77 (Fed.Cir.1996); *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1309, 51 USPQ2d 1161, 1169 (Fed. Cir.1999).

In construing claim 5, the district court determined the term "memory selection second switch means" encompasses the same scope as the "memory selection switch" of claim 1. Specifically, the district court determined that "memory selection second switch means" covers only the mechanical switch of Figure 2, not the software embodiment of Figure 3. The written description of the '364 patent and the prosecution history, however, reveal a broader meaning of "memory selection switch means."

As previously explained in this court's analysis of claim 1, Figure 3 illustrates a flow diagram "describ[ing] both the operate and program modes of the invention." '364 patent, col. 4, ll. 23–24. The two lower-right corner dialog boxes of Figure 3 describe steps to "store code at location *pointed to* by the code location *pointer*" and "*increment* code location pointer[;] if pointer increments over five then *load* code location pointer with one." *See id.* at Fig. 3 (emphasis added). Dr. Rhyne's expert testimony shows that one of ordinary skill in the computer science art would understand the underlined terms to describe software operations.

Although software operations do not fall within the literal scope of the "memory selection switch" in claim 1, the reissue

prosecution history also discloses a broader reading for the "switch means" of claim 5. First, the patentees' representation to the Patent and Trademark Office in its November 29, 1989 sworn declaration indicated their intent to include the algorithm of Figure 3 as a "corresponding structure" for the switch means. The patentees stated:

> We believe the aforesaid Letters Patent to be wholly or partly inoperative or invalid by reason of our *claiming less than we had a right to claim* in the patent. More specifically, we believe the sole independent original claim [i.e., claim 1 of the '118 and now claim 1 of the '364 patent] is *too narrow* in three respects:
>
> . . . .
>
> (c) The claim requires a "switch moveable" and a *"memory selection switch"* but should have required a—first switch means—and a—*memory selection switch means*—, respectively, because switch means *includes electronic switches as well as mechanical switches.*

J.A. at 5388 (emphasis added). While this statement weighs against construing claim 1 to include software operations, it gives a broader reading to claim 5. This statement evinces the patentees' use of the term "switch means" to include microprocessor operations driven by software, i.e., "electronic" switches, as opposed to a mechanical switch of Figure 2. The patentees' use in claim 5 of the term "switch means" rather than "switch" and "being adapted to select" rather than "setable" and "set," to describe software operations, further support a broader construction.

Later in the reissue proceedings, the patentees argued in response to an anticipation rejection:

> Applicants' method and apparatus is intended to simplify the remote control of equipment by code transmitters. . . . Such simplifications are provided by including multiple storage locations in the receiver and including a *programming*

*routine* which receives and stores codes transmitted from the code transmitters of the system.

J.A. at 5822 (emphasis added). This statement further supports reading "switch means" to include structure corresponding to Figure 3.

The differences in claim language, bolstered by the patentees' statements during the reissue proceedings, cause this court to reach a broader construction for claim 5 than for claim 1. *See Vitronics*, 90 F.3d at 1582. The district court erred in ruling that only the mechanical switch in Figure 2 is "corresponding structure" for the claimed "switch means." "Switch means," when properly construed, also covers the software-based embodiment described in Figure 3.

■ Chamberlain asserts that, should this court construe claim 5 to cover the software embodiment of Figure 3, then it is entitled to summary judgment of literal infringement. An accused device satisfies a means-plus-function element literally if it performs the identical function required by the limitation, and incorporates the structure disclosed in the specification or an equivalent thereof. *See Cybor*, 138 F.3d at 1456. The language of claim 5 and the written description establish that the function of "switch means" is to select different memory locations, thereby enabling the microprocessor to store transmitter identifiers in the memory locations. The parties do not dispute that the Intellicode's memory selection software program performs this function.

The Intellicode, however, constitutes a different "structure" than the software disclosed in the '364 patent because it uses a different algorithm to perform the recited function. Figure 3 and the corresponding description indicate that the code location pointer increments through a series of memory locations, automatically erasing the previous contents of a memory location when it stores a new transmitter code in that location. When the pointer can no longer increment, i.e., when it is pointing to the last memory location in the series, the microprocessor "load[s] code location pointer with one," causing the pointer to loop back and select the first memory location in the series. The Intellicode, on the other hand, randomly chooses an unused memory location. Thus, the Intellicode's memory selection scheme is not identical to the structure disclosed in Figure 3 of the '364 patent.

■ Moreover, Overhead Door presented evidence that its memory selection scheme is not structurally equivalent to that of Figure 3. A structure in an accused device is equivalent to the disclosed structure corresponding to a means-plus-function element if it is insubstantially different from the disclosed structure. *See Chiuminatta*, 145 F.3d at 1309. Overhead Door urged that the Intellicode software is substantially different from the claim element because its software uses memory more efficiently and minimizes the chances of overwriting previously-stored codes. Viewing the evidence in a light most favorable to the non-movant Overhead Door, this court finds that Overhead Door has raised a genuine issue of material fact precluding summary judgment of literal infringement of claim 5. Accordingly, this court remands for the fact-finder to determine whether the Intellicode uses a structure equivalent to the mechanical switch in Figure 2 or to the software-implemented algorithm in Figure 3, for selecting different memory locations.

### "Switch Moveable" – Claim 1

■ This court also agrees with the district court that "switch moveable" of claim 1, i.e., the program/operate switch, is present in the accused device. The district court properly construed this element as a "moveable[ ] switch connected to the microprocessor having at least two positions." The mechanical switch of Figure 2 supports this construction. Contrary to Overhead Door's assertion, neither the claim language nor the specification re-

quires each switch position to be stationary and completely user-selected.

Applying the trial court's correct claim construction to the accused device, this court affirms the district court's finding that the Intellicode's two-position, spring-loaded, push-button switch satisfies the "switch moveable" limitation. In affirming, this court understands that the accused switch returns to a stationary position when the user releases the push-button. The parties do not dispute that the program/operate switch of the Intellicode is "a mechanical, two position, user-operated switch." Overhead Door urges, however, that its momentary switch does not have an operate position, the program position is not stationary, and the switch does not permit the user to select the "operate" mode. This court finds this argument unpersuasive. The Intellicode two-position switch is "a mechanical switch movable between an operate and program position at least momentarily and is connected to the microprocessor." Thus, this court affirms the district court's summary judgment ruling insofar as it rested on the finding that the Intellicode literally meets the "switch moveable" requirement.

## "First Switch Means" – Claim 5

Claim 5 recites "first switch means for selection between program and operate positions connected to said microprocessor." This claim element uses the term "means" and the claim does not specify any structure or material for performing the recited function. Therefore, the district court properly held "first switch means" is a means-plus-function element under 35 U.S.C. § 112, ¶ 6. *See Al–Site,* 174 F.3d at 1318. Thus, "first switch means" covers the disclosed structure, i.e., mechanical switch 22 and its structural equivalents. Specifically, Figure 2 shows mechanical switch 22 as a two-position, moveable switch. As discussed above, this court finds that the "switch moveable" element is literally present in the Intellicode.

Similarly, the "first switch means," properly construed as a two-position, mechanical switch or its structural equivalent, is also literally present in the Intellicode. This court therefore affirms the district court's judgment.

## "Different Codes" – Claims 1 and 5

The district court also addressed the "different codes" element of claims 1 and 5, and found these elements literally present in the Intellicode. In particular, the district court construed "different codes" to mean "factory-defined codes stored within the radio transmitters which uniquely identify each different transmitter and are not selectable or modifiable by the user of the garage door opener ("GDO") system." The district court's interpretation of this term is consistent with the claim language and finds support in the written description. The claim language requires association of each code with a different transmitter. The written description notes that each code uniquely identifies a transmitter. The specification adds that the codes are set in a factory and remain unchangeable by the user "to eliminate the requirements for code selection switches in the transmitters." '364 patent, col. 1, ll. 53–54.

The claim language does not supply any further constraints on the meaning of "codes." *See Vitronics,* 90 F.3d at 1582. Claims 1 and 5 do not require an identical code in the transmitter and the receiver. The language of both claims recite "that the code of said first transmitter will be stored in said memory means." Properly construed, this language requires the memory to retain the code it associates with the "first transmitter." The claims, however, do not require that the memory store the exact sequence of coded bits transmitted from the transmitter as its identifying signal. This reading of the claim language finds support in the written description, which explains that a code is associated with a transmitter. It does not describe any particular format, encryption,

or alteration in transmitted and stored codes. The district court thus avoided interpreting "codes" so narrowly that any simple reformatting or addition of a single bit at the end of the code before storage would avoid the literal scope of claims 1 and 5.

In the Intellicode system, the unique, fixed, factory-programmed string of binary numbers in the transmitter do not match exactly the bits stored in the microprocessor's memory. Rather the Intellicode encrypts the transmitter code for transmission creating a different string of bits, the so-called "hopping code." The Intellicode microprocessor in "program" mode stores a secret key (yet another string of bits), and thereafter in "operate" mode uses the secret key to verify authorized (i.e. previously learned) transmitters. These features of the Intellicode, as explained above, however, do not avoid literal infringement of the "different codes" element. Thus, this court affirms the district court's construction of the "different codes" element and its finding that this element is literally present in the Intellicode.

### III.

In conclusion, this court affirms the district court's grant of Overhead Door's motion for summary judgment of no literal infringement of claim 1, but vacates the summary judgment of non-infringement under the doctrine of equivalents. Specifically, the district court correctly found as a matter of law that the accused device literally includes the "switch moveable" and "different codes" claim elements and does not literally include the "memory selection switch" element. The district court erred, however, in deciding on summary judgment that the accused device does not contain an equivalent of the "memory selection switch." This court concludes that this is a genuine issue of material fact to be determined by a fact-finder.

As to claim 5, this court vacates the district court's grant of summary judg-

ment of non-infringement. The district court erred in finding as a matter of law that "memory selection second switch means" is absent in the accused device either literally or under the doctrine of equivalents. This court concludes that this is a genuine issue of material fact to be determined by a fact-finder. The district correctly found, however, that as a matter of law the accused device literally contains "different codes" and "first switch means."

The court therefore remands this case to the district court for further proceedings in accordance with this opinion.

### COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, VACATED–IN–PART, and REMANDED.*